## Commonwealth *v.* John B. Cook, Appellant.

*Criminal law—Murder of the first degree—Evidence.*

A finding of murder of the first degree will be sustained where the evidence shows that the prisoner threatened the deceased and shot over her head, that she swore out a warrant for his arrest, after which he laid in wait for her, and as she passed him deliberately shot her in the back at short range with a pistol; that after she cried out " I am shot," he again shot her in the back, and after the shooting left the place where he lived, in pursuance of previous preparation, and went into another state, where he remained until he was arrested.

Argued Jan. 7, 1895. Appeal, No. 18, Oct. T., 1895, by defendant, from judgment of O. & T. Washington Co., Aug. T., 1894, No. 47, on plea of guilty. Before Sterrett, C. J., Green, Williams, McCollum, Mitchell, Dean and Fell, JJ. Affirmed.

Indictment for murder. Plea, guilty.

On proceedings to determine the degree of the prisoner's crime, the court below filed the following opinion by McIlvaine, P. J.:

" FACTS.

" The testimony, in our opinion, establishes beyond a reasonable doubt, the following facts:

" 1. At Jumbo Coal Mines, in this county, there is a row of miners' houses, divided into three blocks of four houses each ; there are open spaces between blocks 1 and 2, and between blocks 2 and 3, each of which is twenty-five feet wide and thirty-one feet deep—the depth of the houses; the houses front to the east and are numbered from 1 to 12 consecutively, commencing at the south end of the row; there is a path along both the front and rear of the row and the kitchen doors open out on to the path in the rear ; back, and in the rear of the row, is a wood; the defendant, in May, 1894 (with a woman by the name of Blanche Butler), lived in house No. 11; Lizzie Smith, the deceased, and her husband, Luther Smith, lived in No. 8; Mary Allison lived in No. 3, Ella Strickler in No. 5, and Moses Branham in No. 1.

" 2. On Sunday, May 6, 1894, the defendant came up from

VOL. CLXVI—13

No. 11 to in front of No. 8 or 9, where Lizzie Smith, the deceased, was standing, and charged her with 'bulldozing' his woman, Blanche Butler, and said he wanted it stopped, that he would 'kill for that woman;' and during the altercation between him and the deceased he pulled his pistol, pointed it in her face, then raised it and fired over her head; [Lizzie Smith threatened to sue him for what he had just done, and he said if she attempted to have him arrested he would give her something to sue for—he would shoot her.] [1]

"3. Monday, May 7, 1894, Lizzie Smith went to the office of a justice of the peace in McDonald borough—less than a mile distant—and made complaint against the defendant, and a warrant was issued to the constable, who came to Jumbo to arrest him; he was apprised of the errand of the constable and went into the wood back of the row to evade arrest; after the constable had left the row he returned, and was about the place until about five o'clock in the evening; during the day some mutual friends made an effort to have the difficulty between the defendant and the deceased compromised; Mrs. Smith offered to take one dollar and drop the prosecution if the defendant would pay the costs ($3.60); this he refused to do; during the afternoon he and Blanche Butler were arranging to leave the place, and one reason he gave for not compromising was that he had fixed to leave; [during the day the defendant, on seeing the deceased leave the row and start toward McDonald, said to Mary Allison (the witness whom he afterward met just after the shooting), 'there she goes to sue me, I will get her when she comes back, you watch me and see if I don't get her.'] [2]

"4. About five o'clock on Monday evening, May 7, 1894, Mary Allison and Lizzie Smith were in the house of A. P. Christian, No. 4, having their hair curled for a dance which they expected to attend that night; while they were in there the [defendant was standing in the space between houses No. 4 and No. 5, not far from a clothes line that was stretched between the houses at the rear, and in such a position that he could hear what was going on or being said in the house of Mr. Christian]; [3] Moses Branham about this time came from his house, No. 1, to the defendant and entered into a conversation with him, and Blanche Butler was standing at the front corner of house No. 5,

some thirty-five or forty feet away; Branham in the conversation asked the defendant if he had compromised or would compromise with Mrs. Smith; he said that he would not, that he had fixed to go away and that he would not do anything; he said further that he guessed Mrs. Smith had out spies for him; about this time Lizzie Smith and Mary Allison came out of the kitchen door of No. 4 and started down the rear along the path toward No. 5, which took them past and near to Cook, the defendant; they were talking and laughing as they passed down the path; they passed the defendant, and when past and still within ten or twelve feet of him, he raised his pistol—a 38-calibre Smith & Wesson—and willfully and deliberately, without a word having passed between the parties, fired two balls into Lizzie Smith's back; one bullet struck the back at a point about one half inch to the right of the spine and about four and one half inches above the lower end of the backbone, and passed through the body and lodged in front just above the pelvic bone, searing, in its course, the lower part of the bowels, and passing through the peritoneum in two places—rear and front;—the other bullet struck the back about an inch from where the first struck, and passed inward and, by deflecting, downward to the thigh, lodging on the inside of the right leg about two inches above the knee; when the first shot struck the deceased she threw her hand back on her hip and cried, 'I am shot;' the second shot was fired immediately after this outcry; Mary Allison, who was with Lizzie Smith, when she heard the first shot, ran down the path to the rear of No. 8, through No. 8 to the front, and up the front toward No. 5; on the front she met the defendant, who was reloading his pistol or taking out the exploded cartridges; he said to her, as they met, 'I got her that time']; [3] that night he left Jumbo, and sometime afterwards was arrested in West Virginia, where he lived before he came to Jumbo in 1892; while in West Virginia he wrote to a friend in Jumbo inquiring if Mrs. Smith was dead.

" 5. Mrs. Smith, when shot, ran into the house No. 5, to Ella Strickler, passing through the kitchen door in the rear; from No. 5 she was carried home to No. 8, where she died on May 14, 1894, from inflammation caused by the wounds inflicted by the defendant; [the natural and probable result of the inflicting

of the wounds found on the deceased, considering their character and location, was peritonitis and death.] [4]

" 6. [The defendant being examined as a witness in his own behalf, admitted that he purposely fired at the back of the deceased,] [7] but he said that he intended to shoot her in the legs and did not intend to kill her. He denied that he heard her scream 'I am shot' immediately after the first shot was fired, and said that he shot the second time because he thought the first shot had not hit her.

### "LAW.

" In considering the bearing these facts have on the question for determination, we have given due consideration and been guided by the following legal principles :

" 1. The presumption of the law is, that the defendant, under his plea, is guilty of murder of the second degree, and the burden is on the Commonwealth to show beyond a reasonable doubt that he is guilty of murder of the first degree.

" [2. Notwithstanding the burden of this proof is on the Commonwealth, yet ' it is not necessary that the evidence should be express; it is sufficient if, from the nature and use of the weapon, and the acts and conduct of the defendant, his intention to kill can be fully, fairly and justly inferred, with so much time used and opportunity for deliberation as to convince that his purpose was willful and premeditated.'

" 3. Not only malice but an intent to kill may, in the absence of qualifying facts, be inferred from the use of a deadly weapon —such as a 38-caliber Smith & Wesson pistol—upon the body of another at some vital part where the intention to use such a weapon in such a way is manifest, and where the shot is fired willfully, deliberately and premeditatedly.

" 4. If the shooting of Lizzie Smith by the defendant was intentional, and not accidental, then malice and a design to kill may be presumed from the repeated use of his pistol—a deadly weapon—and the infliction of a mortal wound; for the law adopts the common and rational belief that a man intends the usual, immediate and natural consequences of his voluntary act. Human reason will not tolerate the denial that a man who intentionally, not accidentally, fires a pistol ball through the body of another, has a heart fatally bent on mischief and intends to kill.] [8]

### " CONCLUSION. ·

" [After a careful consideration of the facts in this case as they appear in the evidence, we are very reluctantly forced to the conclusion that the defendant intended to kill the deceased, and that he fired the shots, which proved fatal, willfully, deliberately and premeditatedly. His declaration on the witness stand that he purposely shot the deceased intending only to do her bodily harm, and not to kill, is not to be credited; it is inconsistent with all the other facts in the case, and is evidently an afterthought born of the exigencies of his case. He might as well have said he shot to scare and did not intend to hit her, and that the injury was the result of a mistaken aim; or that the difference between the line of fire and the line of sight in his pistol was responsible for the death of Lizzie Smith, and that he should, therefore, be relieved from the natural and probable consequences of his own voluntary act.

" The killing was not on a sudden impulse, but evidently was preconceived. Having made all things ready to leave Jumbo, and the time of his departure having arrived, he armed himself and then selected his position to await the appearance of her against whom, according to his own declarations, he had a grievance and with whom he wished to square accounts before he left; she appeared; he allowed her to walk a few feet past him; then he deliberately, at close range, fired a shot into her back; she cried 'I am shot;' notwithstanding this cry he, as deliberately, fired a second shot, when she passed out of the range of his pistol; then he walks away, coolly reloading his pistol, and to one to whom in the morning he had said, 'I will get her when she comes back; you watch me and see if I don't get her,' he says, 'I got her that time;' he then immediately carries into execution his previously declared purpose to leave the place, and is not heard of until his presence is discovered in West Virginia, where he was arrested.

" ' What must we say of an act so plainly directed at the life of another, so unprovoked, cruel and cowardly, done with a deadly weapon under no circumstances of rage or passion produced by a reasonable provocation? Clearly there was sufficient time to think, deliberate and premeditate the act; as clearly the act was willful and intentional, and the instrument a deadly one aimed to inflict a wound which naturally and prob-

ably would result in death.    What other intention than an intention to kill could be rationally inferred from the whole conduct of the defendant?' It is only because there is no escape from it that we find the crime, which the defendant has confessed, is murder in the first degree.

"And now, September 24, 1894, after the examination of witnesses and hearing had in due form of law, and upon due consideration, it is now, in open court, the defendant, John B. Cook, and his counsel, being present, adjudged and determined that the crime, and the degree of the crime, whereof the said John B. Cook is convicted by his own confession, is murder of the first degree." [9]

*Errors assigned* were (1–5, 8, 9) portions of opinion in brackets, quoting them.

*Wm. M. Randolph, T. B. Brownlee,* and *J. E. Barnett* with him, for appellant, cited: Johnson v. Com., 24 Pa. 386 ; Com. v. Drum, 58 Pa. 9 ; 9 A. & E. Ency. L. 557 ; Onofri v. Com., 20 W. N. 264 ; Murray v. Com., 79 Pa. 311.

*W. S. Parker,* district attorney, for appellee, not heard.

PER CURIAM, Jan. 21, 1895:

As appears by the record, the prisoner was duly arraigned and pleaded guilty to the indictment charging him with the murder of Lizzie Smith. It thereupon became the duty of the court to "proceed, by examination of witnesses, to determine the degree of the crime, and to give sentence accordingly." Witnesses were examined, and, upon due consideration of their testimony, it was adjudged and determined by the court that the degree of the crime, whereof the prisoner by his own confession stands convicted, is murder of the first degree, and thereupon the sentence of the law was pronounced upon him.

In the record before us, we have the testimony of the witnesses who were examined, the learned judge's findings of fact, and his conclusions of law.    A careful consideration of the former has convinced us that there is no error in the findings of fact.    They are each and all fully warranted by the testimony. The only conclusion that can be rationally drawn from the

facts thus established is that the murder, confessed by the prisoner's plea of "guilty," was "willful, deliberate and premeditated," and therefore murder of the first degree. All the facts and circumstances, connected with the shooting, point clearly and satisfactorily to a specific intent to kill, and are wholly inconsistent with any other reasonable hypothesis arising out of the evidence.

In view of the clear and satisfactory opinion of the court below, in which the questions involved are fully considered and correctly disposed of, further comment is unnecessary. For reasons there given we are of opinion that neither of the assignments of error should be sustained.

The judgment of the court of oyer and terminer is therefore affirmed, and it is ordered that the record be remitted for the purpose of execution.